Ruffin, C. J.
 

 At common law a valid marriage was indissoluble, except by legislative action; and a second marriage, or rather, pretended marriage, was and is, absolutely void.
 
 Gatling
 
 v.
 
 Williams,
 
 decided at this term. A statute in 1814 admits of judicial sentences of divorce from the bonds of matrimony in certain cases; and provides, that, after such ,a sentence, all th.e duties, and rights of the parties, in right of the marriage, shall cease, and the complainant or innocent person shall be at liberty to marry again, as if he or she had never been married. It became a doubt upon this act, wheth ,er the prohibition to marry, which arose out'of the first mar
 
 *537
 
 riage, continued as to the offending party, or not; for, though capacity to contract a second marriage is expressly given to the injured party alone, and thence a highly probable legislative intention may be inferred, that the guilty party should not have such capacity, yet when the consequence of such a construction would be to involve that person in the guilt and pains of felony, a Court would naturally hesitate, and perhaps feel bound to hold, that the capacity to marry again legally resulted to both parties from the dissolution of the previous marriage, without some express negative words. It seems, that the same doubts have been entertained, and caused much parliamentary discussion, in England, where the offending party married after divorce by statute; which is usually drawn, so as to declare the marriage dissolved and made void to all intents and purposes; but super-adding authority to the injured party alone to marry again, and making the issue of such marriage legitimate. But it is said to be the better opinion, that such second marriage of each party is valid, andthat_ opinion is sanctioned by usage. It is, however, concluded by all, that, if the statute contain prohibitory words on the offending party, that party cannot marry, and the incapacity arising out of the first marriage continues, notwithstanding the divorce. Shelford on Marriage and Divorce, 476. To clear all doubts upon the point in this State, and to express distinctly, what was, probably, the intention from the beginning, the act of 1827 enacts, than no defendant or party offending, who shall be divorced from the bonds of matrimony, shall ever be permitted to marry again; and if he or she shall offend against the act he or she shall be subject to the pains and penalties, which are inflicted by law upon persons guilty of bigamy. It is
 
 clear,
 
 therefore, upon this latter act, that, notwithstanding the general terms in which a divorce
 
 a vinculo
 
 is expressed, as dissolving and annulling the marriage, its existence is continued, so far, at least, as it forms an impediment to the offending party’s forming a second marriage, during the life of the divorced husband or wife. For, by a second marriage, the offending party becomes, according to the words
 
 *538
 
 of the act, guilty of bigamy ; in which the party is charged with marrying a second time, “his or her former wife or husband being alive.” It is sufficient to invalidate a second marriage, to shew a prior one, and the parties still living, and it is for the parties to such second marriage to shew a capacity to contract, newly acquired. That the party attempts by showing the divorce; but that confers the capacity on one of the parties only and expressly withholds it from the other. It is then, unquestionable, that if this second marriage, in this case, had been celebrated in this State, it would have subjected the plaintiff to the pains of bigamy, and would have been void. The case stands, as to her, precisely as if there never had been a divorce; and,
 
 fro hac vice,
 
 the first marriage is still subsist’ ing.
 

 We conceive the second marriage acquires no force by the celebration of it having been in South Carolina. We have been at some loss to determine in what sense we are to understand the phrase in the case, that the parties married in South Carolina “according to the laws of that State.” We suppose it was meant to say thereby, merely, that the ceremony was duly celebrated with the formalities, and by the persons, and with the witnesses, there requisite to constitute a marriage.— It would be great injustice to our sister State-to assume, that by her laws her own citizens can marry a second time, a former marriage not being dissolved by death or divorce; or that she makes it lawful for citizens of other States, who have married at home, and by their domestic laws cannot marry a second time, to leave their own State and go into South-Carolina expressly to evade their own laws, and, without acquiring a domicil in South Carolina, contract a marriage there. We cannot suppose, that South Carolina allows of polygamy, either by her own citizens or
 
 those of any
 
 other country.— Therefore we might cut the case short at that point, upon the presumption, that, the contrary not expressly appearing, the law of South Carolina does not tolerate this marriage more than our own law does. Indeed, we believe, that in truth she does not so much, as we have been informed, that she grants
 
 *539
 
 no divorces. But if it were otherwise, we should still hold the marriage Void. We do not undertake at present to say, what might be the effect of a marriage of a person, in the situation of this plaintiff, contracted in another State, in which she had become
 
 bona fide
 
 domicilled. It seems to be the settled law of England, that an English marriage cannot be effectually dissolved by any proceeding in a foreign Court, though the parties be domicilled abroad.
 
 Lally's case,
 
 1 R. and R., Cr. C., 236. Though that case was questioned by Lord Brougham in the House of Lords in
 
 Warrender
 
 v.
 
 Warrender, 2
 
 Clark
 
 &
 
 Finn. 541, yet it was sustained by Lord Lyndhurst, as the advised judgment of the twelve Judges ; and was afterwards acted on by Lord Eldon in
 
 Tovey v. Lindsay
 
 in the House of Lords, and its authority was fully admitted, as the law of Westminster Hall, by Lord Brougham himself in
 
 McCarthy
 
 v.
 
 Decaix, 2
 
 Russ
 
 &
 
 Mylne, 614. In this last case he held, that, where a Danish subject married in England, and carried his wife home and lived in Denmark, and was there divorced, and, under the belief that it was effectual, the husband gave up to his wife’s relations upon her death her personal property, the divorce was so utterly inofficious, that the husband was not only declared to have been entitled to the personal property of the wife, but to set aside his previous voluntary assignment of.it, as having been given under a gross mistake. That was certainly carrying the doctrine to the utmost extreme. We do not say it was not correct. But the Court is not inclined to go out of our case and volunteer an opinion upon a question, that has been so much discussed, and on which the tribunals of different nations have come to opposite determinations. The case before us is not one of a domicil out of North Carolina, but it is stated that the parties were domicilled here, and went to South Carolina in fraud of our law. Now, if the law of South Carolina allow of such a marriage, and although it be true, that, generally, marriages are to be judged by the
 
 lex loci contractus,
 
 yet every country must so far respect its own laws and their operation on its own citizens, as not to allow
 
 *540
 
 them to be evaded by acts in another country purposely to defraud them. It cannot allow'suchacts abroad, under the pre-tence that they were lawful there, to defeat its own laws at home, in their operation upon persons within her own territory. If a person contract marriage here, and, living the other party, he goes to Turkey, and marries half a dozen wives, contrary to the laws of this State, it would be impossible that we could give up our whole policy regulating marriages and in. heritances, and allow all those women and children to come in here, as wives and heirs, with the only true wife and heirs, according to our law. And it would be yet more clear, if two persons were to go from this country to Turkey, merely for the sake of getting married at a place in which polygamy is lawful, and then coming back to the place, where it is not lawful. Our case therefore is like, that of
 
 Conway
 
 v.
 
 Beaz
 
 ly, 3 Hagg., 639, in which persons, domicilled in England, were divorced in Scotland, and
 
 then one of them married again in
 
 Scotland, and upon coming again into England, that second marriage was declared null, though it was admit, ted to be good by the law of Scotland. It was so declared upon the grounds of the personal incapacity of one of the parties to contract, when his first wife was living, by the law of England, and of the fraud on the law of England by a subject of England; which is precisely our case. The ecclesiastical Judge, Dr. Ltjshington, after admitting the general rule as to the obligation of the
 
 lex loci contractus
 
 and that the marriage was valid in Scotland, said, “there was a preliminary consideration — the capability of the party to contract marriage — and the true question is, whether that capability is to be determined by the law of Scotland or the law of England.” And, carefully reserving his opinion upon the question, when a case should appear
 
 oí
 
 a
 
 bona fide
 
 Scotch domi-cil, he afterwards decided the marriage to be void on the grounds, already stated, of the domicil in England and the consequent fraud upon the law of the party’s own country. Certainly every country should be disposed to respect the laws of another country; but not more than its own. That ought not
 
 *541
 
 to be expected. If a Turk with two wives were to come here, we would administer to them the justice due to the relations contracted by them at home. But an American marries at home, where plurality of wives is excluded, and, then, contrary to his engagement with that wife, takes another, where a plurality of wjves is tolerated, and the first wife claims the benefit o£ the- law of her own country from the Courts of her own country, while the second wife claims from the same Courts the immunities and rights conceded to her in the law of her original country: These claims are incompatible and one only can be granted; and it is easy to see, that the obligations, arising out of the first contract are to be sustained by the country in which they were assumed; and that our Courts must hold the second marriage void in our law, which denied1' the capacity to contract it. For the same reason we must obey the positive injunction of our Statute, which applies to this case.
 

 The Judgment of the Superior Court reversed and that of: the’ County Court, dismissing the petition affirmed.
 

 Feu Curiam; Judgment accordingly.